**CANADIAN NATIONAL RAILWAYS, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Protest 64/15096–3448; C.D. 3248.**

United States Customs Court
Second Division.

Jan. 11, 1968.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz and Earl R. Lidstrom, Chicago, Ill., of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen., New York City (Bernard J. Babb, New York City, trial attorney), for defendant.

Before RAO and FORD, JJ.

RAO, Chief Judge:

Certain articles designated as "rail anchors" were classified for customs duty purposes upon importation into the United States as articles or wares, composed in chief value of iron or steel, not specially provided for, within the purview of paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T.D. 54108, and were assessed with duty at the rate of 19 per centum ad valorem.

Plaintiff herein contends that said classification and duty assessment were incorrect, alleging three alternative classifications carrying lower rates of duty, namely as "rail braces" or as "all other railway bars made of iron or steel" in paragraph 322 of said tariff act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, which provides a duty rate of 0.05 cent per pound, or as forgings of iron or steel of the kind provided for in paragraph 319(a) of said tariff act, as modified by the sixth protocol, supra, and subjected to duty at the rate of 10½ per centum ad valorem.

The various statutory provisions cited above are here set forth for ready reference:

Paragraph 397 of the Tariff Act of 1930, as modified by the sixth protocol, supra:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\* \* \* \* \* \*

Composed wholly or in chief value of iron, steel \* \* \* but not plated

with platinum, gold, or silver, or colored with gold lacquer:

\*   \*   \*   \*   \*   \*

Not wholly or in chief value of tin or tin plate:

Carriages, drays,  \*  \*  \*.

\*   \*   \*   \*   \*   \*

Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum (except \* \* \*) . . . . . . . . . . . . . . 19% ad val.

Paragraph 322 of the Tariff Act of 1930, as modified by the Torquay protocol, supra:

Rail braces, and all other railway bars made of iron or steel, and railway bars made in part of steel, T rails, and punched iron or steel flat rails . . . . . . . . . . . . . . . . . 0.05¢ per lb.

Paragraph 319(a) of the Tariff Act of 1930, as modified by the sixth protocol, supra:

Forgings of iron or steel, or of combined iron and steel, not machined, tooled, or otherwise advanced in condition by any process or operation subsequent to the forging process, not specially provided for. . 10½% ad val.

A sample of the involved rail anchors was received in evidence as plaintiff's exhibit 1. Plaintiff offered in evidence as illustrative exhibit 2 a pamphlet entitled "The Reliance Rail Anchor" which illustrates the rail anchors in controversy and describes the manner of their use.

The parties are in agreement that the rail anchors in question are composed of iron or steel.

Two well-qualified witnesses were called to testify, one for the plaintiff and the other for the defendant.

Plaintiff's witness, Stephen M. Lounsberry, Jr., who holds a mechanical engineering degree from Cornell University, stated that he has been connected with the Moore & Steele Corporation since 1936 and has served as its vice president since 1946. The Moore & Steele Corporation is engaged in the business of designing, developing, and engineering of railway devices for railway tracks. The witness stated that he is a coinventor of the anchors in issue; that said anchors were patented in the United States in 1958; and that other rail anchors serving the same purpose were in use prior to the designing of exhibit 1.

Lounsberry testified that he is familiar with the manner in which rail anchors such as exhibit 1 are produced, which method of production is the same in the United States and in Canada, in which latter country the instant shipment originated. A rail anchor according to this witness, is produced by heating a bar of high carbon steel or alloy spring steel until it becomes plastic at which time it is put into dies which form it into the desired shape. It is then dropped into an oil bath which quenches it from a temperature of 1500 degrees Fahrenheit down to 100 or 200 degrees. Thereupon, the article is placed in a draw furnace where it is tempered to the desired hardness.

The resultant product which measures about 7 inches in length and approximately 1¾ inches in width is so contoured that the lower and upper jaws of the anchor fit around one side of a rail. The anchor is then driven or pushed so that it snaps onto the opposite side around the bottom of the rail base and is so placed as to press against the tie plate. Its purpose, according to Witness Lounsberry, is to cause the rail to resist longitudinal movement.

A tie plate is a piece of steel or iron inserted between a rail and a tie to provide a pad for the rail to rest on. A railway fish plate, which is synonymous with a splice bar, is a bar used to join the ends of rail together in order to make a continuous railway track.

The witness stated that he buys and sells articles such as exhibit 1 as "rail anchors". He is also familiar with "rail braces" and has seen them in use but testified that his company does not handle them. He explained that a rail brace is either a forging or a casting used to prevent the lateral movement of rail.

A sheet of paper containing an illustration and printed matter descriptive

of a particular kind of rail brace, with the brace indicated in its operating position, was received in evidence as plaintiff's exhibit 3.

When asked to describe the differences and similarities between rail anchors represented by exhibit 1 and rail braces illustrated in exhibit 3, the witness stated they are similar in that both the rail anchor and the rail brace are forgings and both serve to brace a rail in one way or another. They differ in that the rail brace has punchings in it for the insertion of spikes whereas the rail anchor does not; and the fact that the rail brace braces laterally whereas the rail anchor braces longitudinally.

The witness Lounsberry who, in addition to being connected with the Moore & Steele Corporation as above set forth, is also a director of Berwick Forge & Fabricating Company, has seen forgings made at the Berwick plant and knows what a forging is. He stated that exhibit 1 is a forging and that it became such an article at the point of manufacture when it was removed from the die and prior to the quenching and tempering operations.

Called to testify on behalf of the defendant was William DeVries who has been in the employ of the New York Central Railroad Company for 37 years, the last 21 of which he served in the capacity of track supervisor. His job involves the maintenance of track, roadbeds, and track facilities such as crossings, drainage, and so forth. He became familiar with rail anchors and rail braces through using them in his work.

He described a rail anchor as a device that is driven onto the base of a rail to prevent the rail from creeping or moving in a longitudinal direction. A rail brace, according to DeVries, is a device that is spiked, bolted, or "lagged" to the side of a rail to prevent it from moving outward. For instance, when a train moves from one track to another, there is an outward thrust as the train enters the switch. Such locations are braced with rail braces.

DeVries stated that rail anchors are never used to serve the purpose of a rail brace, and, to his knowledge, a rail anchor was never considered to be a form of rail brace although it does brace a rail from moving longitudinally.

The witness, stating that there are various types of railway bars, named some as splice bars, also known as fish plates or angle bars, foot blocks, and "puzzle" switches, but added there possibly are others.

■ The first of plaintiff's claims is that the rail anchors in issue are within the common meaning of the term "rail braces" and should be classified as such within the provisions of paragraph 322 of the Tariff Act of 1930, as modified by the Torquay protocol, supra. The common meaning to be given to a term used by Congress in a provision of the tariff act is a question of law to be determined by the court. The rule is well stated in the case of United States v. John B. Stetson Co., 21 CCPA 3, T.D. 46319, as follows:

* * * The common meaning to be attached to a term or word used by the Congress in a provision of a tariff act is a matter to be determined by the court having the same under consideration. In making this determination the court may rely upon its own understanding of the word or term used, and it may assist its own understanding by reference to the works of standard lexicographers, scientific authorities, the testimony of witnesses or by such other means as may be available.

If testimony be offered upon the common meaning of a statutory word or term such testimony is advisory only and has no binding effect on the court. [Citing cases.]

Reference to standard lexicographic authorities discloses whereas Funk & Wagnalls defines "rail brace" it does not define "rail anchor", and that Webster's contains a definition of "rail an-

chor" but not of "rail brace". Said definitions are here set forth:

Funk & Wagnalls New Standard Dictionary of the English Language, 1952—

rail, *n.* \* \* \* r,-brace, *n.* A knee or brace to keep railway-rails from turning over or moving laterally.

Webster's Third New International Dictionary of the English Language, 1963—

rail anchor, *n.* \* \* \*: a device to help maintain the proper line and gage of track by resisting the longitudinal movement of rails under traffic and maintaining proper expansion allowance at joint gaps for temperature changes.

Defendant in its brief makes reference to the following definitions appearing in the Railway Engineering and Maintenance Cyclopedia 1939:

Rail Anchor. See Anti-Creeper (page 62).

Anti-Creeper. A device to prevent the creeping or longitudinal movement of rail in track under traffic. Its function is to hold the rail in a fixed position with reference to a tie. (page 11).

Rail Brace. A metal casting made to fit against the side of a rail or guard rail and to be spiked to the tie on the outside of a track or on the inside of a guard rail to prevent the rail from inclining backward with the thrust of the wheels. (page 11).

While in a broad sense both rail braces and rail anchors may be said to be similar in that they both hold rail in position, it is evident from the foregoing definitions they are two separate and distinct articles in common understanding, each serving a specific function, differing one from the other. A rail brace spiked to a tie or on the inside of a guard rail is used to prevent a rail from spreading laterally, whereas a rail anchor affixed around the base of a rail and positioned next to a tie plate serves to prevent a rail from moving longitudinally.

The fact that rail braces and rail anchors are separate and distinct articles of commerce also finds support in the record before the court. The physical and illustrative exhibits demonstrate their differences in appearance and manner of use. The testimonial record discloses that rail braces and rail anchors are not interchangeable in use and are known as different articles serving separate functions.

Predicated on the foregoing considerations, we overrule the first of plaintiff's claims, namely, that the imported rail anchors should be classified as rail braces within the purview of paragraph 322 of the Tariff Act of 1930, as modified by the Torquay protocol, supra.

The next consideration will be whether the rail anchors in controversy come within the provisions for "all other railway bars made of iron or steel" in said paragraph 322.

In this regard it is interesting to note the language of paragraph 322 of the Tariff Act of 1930 as originally enacted, which we set forth:

Railway fishplates or splice bars, and tie plates, made of iron or steel, one-fourth of 1 cent per pound; rail braces, and all other railway bars made of iron or steel, and railway bars made in part of steel, T rails, and punched iron or steel flat rails, one-tenth of 1 cent per pound.

The language quoted above first appeared in the Tariff Act of 1922. The act prior thereto, the Tariff Act of 1913, did not provide *eo nomine* for "tie plates" or "rail braces". Explanatory of the change in language by which tie plates and rail braces were included within the provisions of paragraph 322 we quote the following from the 1921 Summary of Tariff Information prepared by the United States Tariff Commission for the use of the Senate Committee on Finance at the time the Tariff Act of 1922 was in preparation:

## RAIL SPLICE BARS AND BRACES

Description and uses.—Splice bars, fishplates, tie plates, etc., are used for connecting endwise and holding in place

rails on a roadbed. They embrace the general group of rail joints and fastenings, but not spikes, bolts, nuts, and similar material. \* \* \*

\* \* \* \* \* \*

Suggested changes.—In view of the importance of tie plates, these should be mentioned as well as railway fishplates or splice bars and "all other railway bars made of iron or steel" designated by the term "rail braces." The latter term is more specific than the phrase "all other railway bars made of iron or steel," and is sufficiently inclusive to describe with precision what is intended to be covered in this part of the paragraph.

In the enactment of paragraph 322 of the Tariff Act of 1922, the prototype of paragraph 322 of the Tariff Act of 1930, Congress not only provided for rail braces but also for *all other railway bars* made of iron or steel. In view of this fact, we are of the opinion that the rail anchors in issue although articles of commerce different and distinct from rail braces are, nevertheless, within the class or kind of articles which are provided for as "other railway bars" inasmuch as like rail braces they were designed, produced, and sold for the sole purpose of holding rails in place on a roadbed.

The court is, therefore, of the opinion that the rail anchors in controversy are encompassed by the provision in paragraph 322 of the Tariff Act of 1930, as modified, supra, for "all other railway bars made of iron or steel," for which duty at the rate of 0.05 cent per pound is provided.

In the light of this conclusion, plaintiff's claim that the imported rail anchors are also encompassed by the third alternative claim, namely, as forgings of the kind provided for in paragraph 319 (a) of the Tariff Act of 1930, as modified by the sixth protocol, supra, becomes untenable in view of the fact that said provision may be invoked only if the merchandise in issue is "not specially provided for" elsewhere in the tariff act, which is not the case here.

Upon due consideration of the record here presented and a review of the authorities cited by the parties in their briefs, the court is of the opinion that the rail anchors at bar should properly have been classified within the provision for "all other railway bars made of iron or steel" in paragraph 322 of the Tariff Act of 1930, as modified by the Torquay protocol, supra, and duty imposed thereon at the rate of 0.05 cent per pound. That claim in the protest is, therefore, sustained. All other claims are overruled.

Judgment will issue accordingly.

FORD, J., concurs.